UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN HALL, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>GOODING COUNTY SHERIFF'S OFFICE, et al.,<br><br>  Defendants. | Case No. 1:22-cv-00277-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Plaintiffs' request under Rule 56(d) of the Federal Rules of Civil Procedure for discovery to respond to Defendants' summary judgment motions. Both the City Defendants[1] and the County Defendants[2] moved for summary judgment. (Dkts. 31, 32). In response to these motions, Plaintiffs filed a document entitled "Response to Defendants' – Gooding County and City of Gooding's Motion for Summary Judgment," which was docketed as a summary judgment response. (Dkt. 33). In fact, however, Plaintiffs' filing does not address the substantive issues the summary judgment motions raise. Rather, it cites Rule 56(d) and requests the Court defer consideration of the motions until Plaintiff receives responses to certain discovery requests. Defendants oppose Plaintiffs' Rule 56(d) motion in a document docketed as a "reply" in

---

[1]  The "City Defendants" refer to the named defendants associated with the City of Gooding, including the City of Gooding Mayor's Office, City of Gooding Mayor Jeffrey Brekke, City of Gooding Police Chief Dave Fisher, and Gooding Police Officer Chase Garey.

[2]  The "County Defendants" refer to the named defendants associated with Gooding County, including the Gooding County Sheriff's Office, Sheriff Shaun Gough, Deputy Chelsea Akers, Deputy Tyler Magnelli, and Deputy Derek Rivera. The collective reference to County Defendants does not include, however, Deputy Andy McClure who is represented by separate counsel.

**MEMORANDUM DECISION AND ORDER** - 1

support of summary judgment. (Dkt. 34). For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' Rule 56(d) motion.

## I. BACKGROUND

The events relevant to this lawsuit began on May 27, 2021, when a white pickup truck got into a "road rage" incident with a semi-truck while driving on the interstate. (Dkt. 36-1 at p. 2). Although the parties dispute the details of the event, the driver of the semi-truck ultimately called law enforcement to report the pickup truck for reckless driving. (Dkt. 35-4 at p. 1). The semi-truck driver reported that the pickup truck driver, who was later identified as Plaintiff John Hall, had tried to run the semi-truck off the road; had made a "finger gun" gesture at the semi-truck; and was wearing a cowboy hat. (*Id.*) When the pickup truck exited the interstate, the semi-truck driver followed the pickup truck to a residence in Gooding County, Idaho and reported the address to dispatch. (Dkt. 31-2 ¶ 6).

Defendant Deputy Andy McClure with the Gooding County Sheriff's Office ("GCSO") responded to the semi-truck driver's call to dispatch. (*Id.* ¶ 1). Dispatch advised Deputy McClure that the pickup truck driver and another male individual were in the driveway of the residence and that one of the individuals was holding an object in his hands. (Dkt. 35-4 at p. 1). Deputy McClure arrived on the scene and observed the semi-truck parked in the street and a white pickup truck driving down the property's long driveway. (*Id.*) Deputy McClure turned into the driveway and observed the white pickup truck turn around and park at the property's residence. (*Id.*) As Deputy McClure arrived at the residence, John and his son, Plaintiff James Hall,[3] approached Deputy McClure's police car. (*Id.*) John was wearing a cowboy hat, and neither of the men were holding a firearm. (Dkt. 35-4 at p. 2; Dkt. 36-2 ¶ 7).

---

[3] At the time of the incident, John was seventy-five years old, and James was forty-eight. (Dkt. 35-4 at p. 1).

**MEMORANDUM DECISION AND ORDER - 2**

At this point, the evidence in the record offers differing accounts of what occurred. Deputy McClure testified in his deposition that his police report about the incident accurately reflects what occurred. (Dkt. 35-3). The report provides in relevant part:

> John and James [were] walking in an aggressive manner towards my patrol vehicle. I was able to exit my patrol vehicle as John came close to my driver door[;] John was yelling at me saying "get that son of a bitch down here now."
>
> I told John to get back as I feared for my safety [due] to his aggressive demeanor towards me and the possibility of weapons being involved. John refused to get back and I again told him to get back. During this interaction I was backed up to the door of my patrol vehicle. I once again told John to back up and he refused to. John was within [arm's] reach of my person so I pushed John in the chest telling him again to get back. Fearing for my safety[,] I had my issued fire arm [sic] unholstered and down to my side. When John continued to ignore my command to back up, I brought my fire arm [sic] up and pointed it at John and told him I feared a gun was involved.
>
> Both John and James began to argue with me about [them] having a gun. I told John and James to put their hands on their head. John [r]eplied to me stating "go to hell[.]" I again told John to put his hands on top of his head and John turned around and began to walk away from me. Again, fearing for my safety because of John's demeanor and his lack of not following instructions . . . [and] not knowing if a gun was actually involved and being [outnumbered] two to one[,] I grabbed John by the back of his shirt and began to pull him to my patrol vehicle so I could secure his person against the car to place him into handcuffs. John began to fight with me[,] and I holstered my fire arm [sic]. I lost grip of John's shirt as he turned towards me fighting. As this was going on John was yelling at me stating "get your damn hands off me" "you son of a bitch" "get your hands off of me." James was also yelling at me telling me to "get my hands off of him" as this was taking place[.] James began to approach me yelling in an aggressive manor. I tried to perform a leg sweep to take John to the ground[,] but I was unsuccessful.

(Dkt. 35-4 at pp. 1-2).

John's account of the incident, however, contradicts McClure's police report in several respects. John claims:

> Neither I nor my son, James Hall, were [] acting in an aggressive manner. When I pulled back into the driveway[] [a]nd by the time that I got out of the pickup[,] the deputy was there getting out of his truck. He jumped out of the pickup, and he said that his sidearm pointed at me says [sic], "You're under arrest[.]" I said, "What for?"[] And I don't remember what his reply was after that. I was walking up to

**MEMORANDUM DECISION AND ORDER - 3**

> him. I wasn't charging him, as he alleges in his report—I was walking up to him, going to have a discussion with him. I felt like that [sic] he ought to go down there and approach that trucker. I think I might have said something to the effect you need to get that trucker down here.

(Dkt. 36-2 ¶ 6). John also claims he never made it to Deputy McClure's patrol car before Deputy McClure grabbed him and attempted to perform a leg sweep. (Dkt. 31-6, Ex. C at 27:1-28:12).

After Deputy McClure failed to detain John, the parties agree that Deputy McClure let go of John, drew his Taser X2, and pointed it at John. (Dkts. 35-4 at p. 2; Dkt. 31-6, Ex. C at 28:13-15). Again, however, the parties offer differing accounts. Deputy McClure claims that he ordered John to get on the ground; John responded, "I'm not going to do it"; Deputy McClure radioed dispatch for backup; and John began walking away from him. (Dkt. 35-4 at p. 2). Conversely, John claims that he does not remember Deputy McClure's order to get on the ground or his own refusal to do so and that he did not walk away from Deputy McClure. (Dkt. 31-6, Ex. C at 29:1-17).

Undisputed, however, is that McClure fired a taser cartridge at John, striking him in the back. (Dkt. 35-4 at p. 2). McClure's incident report states that John fell to the ground and that James moved towards Deputy McClure with his fists clenched and called Deputy McClure a "cock sucker." (*Id.*) McClure then fired a taser cartridge at James, also striking him in the back. (*Id.*) After James fell to the ground, Deputy McClure ordered both men to stay on the ground. (*Id.*) John began to get on his hands and knees, and Deputy McClure tased him again. (*Id.*) Deputy McClure then ordered the men not to move, but when John reached with his right hand under his body, Deputy McClure tasered him again. (Dkt. 35-4 at p. 2). In total, Deputy McClure's taser log indicates he tased John four times and James three times. (Dkt. 32-5, Ex. C at p. 14).

After tasing John and James, Deputy McClure became aware that John's wife, Plaintiff Verla Hall, and his grandson, Anthony Hall, were present. (Dkt. 35-4 at p. 2). Both Verla and Anthony were yelling at Deputy McClure, and Anthony was recording on his cellphone. (*Id.*)

**MEMORANDUM DECISION AND ORDER - 4**

Soon, Defendant Officer Chase Garey with the Gooding City Police Department arrived on the scene and found John and James Hall lying on the ground. (*Id.*) Deputy McClure placed John in handcuffs and instructed Officer Garey to place James in handcuffs, which Officer Garey did. (*Id.*) Deputy McClure informed John and James that they were under arrest for resisting and obstructing a police officer. (*Id.*) When Verla and Anthony Hall began to argue with Deputy McClure about arresting John and James, he ordered them to stay back as he attempted to help John to his patrol car, but they refused. (Dkt. 35-4 at p. 3). At about that time, other law enforcement personnel arrived on the scene, including GCSO Deputies Chelsea Akers, Tyler Magnelli, and Derek Rivera. (*Id.*) Deputy McClure decided to move John and James down the road away from the residence to defuse the situation with Verla and Anthony. (*Id.*) Once down the road, John and James received medical treatment. (*Id.*)

Despite being ordered to stay back, Verla followed law enforcement down the road away from the residence. (Dkt. 32-6, Ex. A at p. 6). Trooper Bryce Rutland with the Idaho State Police approached Verla and informed her that she could not go see John and James while other law enforcement personnel were finishing their investigation. (*Id.*) In his incident report, Trooper Rutland states Verla began to argue with him; he repeatedly asked her to stay back; but she refused to move. (*Id.*) Trooper Rutland's incident report also indicates he eventually placed his hand on Verla's arm to escort her away; she yelled, "do not touch me"; he told her that she was under arrest for obstructing and resisting law enforcement; he ordered her to place her hands behind her back; but she began to physically resist him. (*Id.*). When Deputies Magnelli and Rivera noticed Trooper Rutland struggling to place Verla in handcuffs, they assisted him. (Dkt. 32-5 at 14). Deputies Magnelli and Rivera grabbed Verla's hands and placed them behind her back, and Trooper Rutland placed her in handcuffs. (Dkt. 32-6, Ex. A at p. 6; Dkt. 32-5 at p. 14). Police reports indicate Verla

**MEMORANDUM DECISION AND ORDER - 5**

stomped on Deputy Magnelli's foot multiple times as she was being handcuffed. (Dkt. 32-5 at p. 14).

During this time, Deputy McClure interviewed John and the semi-truck driver regarding the road rage incident. (Dkt. 35-4, Ex. A at p. 4). Ultimately, neither was willing to sign a citation against the other regarding the incident. (*Id.*) Deputy McClure then released John and James and sent a report to the Gooding County Prosecutor's Office for review of charges for obstructing and delaying law enforcement. (*Id.*). No charges were ever filed, however.

Several days after the incident, the GCSO placed Deputy McClure on administrative leave, pending a use of force policy compliance review, which the Ada County Sheriff's Office (ACSO) conducted. (Dkt. 32-5 at p. 3). The ACSO determined Deputy McClure failed to comply with GCSO policy during the incident, and Deputy McClure subsequently resigned from the GCSO. (Dkt. 32-2 ¶ 17).

In August 2022, Plaintiffs sued Defendants alleging claims under 42 U.S.C. § 1983 for excessive force and municipality liability and state law claims for negligent and intentional infliction of emotional distress. The City Defendants and the County Defendants each filed motions for summary judgment.[4] (Dkts. 31, 32). Plaintiffs responded to these motions by seeking relief under Rule 56(d). (Dkt. 33). Plaintiffs responded to the City and County Defendants' motions for summary judgment by filing a Rule 56(d) motion to defer or deny consideration of the motions for summary judgment. (Dkt. 33).

---

[4] Deputy McClure has also filed a summary judgment motion. (Dkt. 35). Plaintiffs responded to the substance of that motion, including by submitting John's declaration and his amended declaration. (Dkts. 36-2, 37, 37-1, 37-2). The City Defendants, the County Defendants, and Deputy McClure all moved to strike John's amended declaration. (Dkts. 39, 40). After these filings, however, Deputy McClure filed for bankruptcy, automatically staying the case as to him. (Dkts. 45, 46).

**MEMORANDUM DECISION AND ORDER - 6**

## II. LEGAL STANDARD

Under Rule 56(d), if a nonmoving party at summary judgment shows by affidavit it cannot present facts to justify denying summary judgment, the court may defer consideration of or deny the summary judgment motion to allow the nonmoving party to conduct discovery, or it may issue any other appropriate order. To prevail on a motion to defer, "[t]he requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *See Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827-28 (9th Cir. 2008) (citation omitted).

## III. ANALYSIS

In their Rule 56(d) motion to defer consideration of the City Defendants' and County Defendants' summary judgment motions, Plaintiffs request additional discovery. In support of their motion, Plaintiffs' counsel submits a declaration identifying eight interrogatories which Plaintiffs propounded on July 19, 2023, and which Plaintiffs contend will aid them in opposing summary judgment. (Dkt. 33-1). The declaration attests each of these eight interrogatories "are specific questions as to training each defendant received as part of their duties as law enforcement officers." (*Id.* at ¶ 4).

The City Defendants and County Defendants respond that the Court should deny Plaintiffs' Rule 56(d) motion because they have not diligently conducted discovery. The City Defendants and County Defendants contend that after their initial disclosures in January 2023, Plaintiffs did not serve any discovery requests for six months and until after they filed their summary judgment motions. The City Defendants and County Defendants further argue Plaintiffs' discovery is unnecessary because they have already provided the requested information to Plaintiffs and

because Plaintiffs have failed to show that the facts sought by the interrogatories are essential to opposing summary judgment.

With three exceptions, the Court agrees Plaintiffs have failed to show their requested discovery is essential to opposing summary judgment. Five of the eight interrogatories, Interrogatory Nos. 11 through 15, seek information supporting allegations in Defendants' answers that do not relate to the summary judgment issues. For example, these interrogatories seek facts regarding Plaintiffs' failure to exhaust administrative remedies; their lack of standing; their comparative negligence; their preexisting injuries; and their damages. These issues do not have any bearing on the summary judgment issues the City Defendants and County Defendants raise in their motions.

Contrary to Plaintiffs' counsel's representation, only Interrogatory No. 20 relates to "employment history and training," and it is limited to Sheriff Gough and Deputies Ackers, Magnelli, and Rivera. Two other interrogatories—Interrogatory Nos. 10 and 16—however, request facts relating to Defendants' "objectively reasonable belief that all conduct was lawful at all times" and Defendants' assertion of qualified immunity. The Deputies' employment histories and training, Defendants' reasonable belief about the conduct being lawful, and their entitlement to qualified immunity are issues bearing on Defendants' summary judgment arguments. Accordingly, Defendants' factual responses to Interrogatory Nos. 10, 16, and 20 may provide facts essential to Plaintiffs' response to Defendants' summary judgment motions.

Because Plaintiffs propounded their discovery requests in July 2023, the City Defendants and the County Defendants should have already provided answers to the requests. To the extent, however, Defendants have not yet responded to those requests, the Court grants Plaintiffs' Rule 56(d) motion regarding Interrogatory Nos. 10, 16, and 20 and orders the City Defendants and

the County Defendants to respond to these interrogatories within ten days of this order's entry. Thereafter, Plaintiffs must respond substantively to the City Defendants' summary judgment motion (Dkt. 31) and the County Defendants' summary judgment motion (Dkt. 32) within thirty-one (31) days of this order's entry. The City and County Defendants will then have fourteen days to reply to Plaintiffs' response.

## IV.  ORDER

IT IS ORDERED that:

1. Plaintiffs' Rule 56(d) motion in its Response to Defendants Gooding County's and City of Gooding's Motions for Summary Judgment (Dkt. 33) is **GRANTED in part** and **DENIED in part**.

2. The City and County Defendants are ordered to provide responses to Interrogatory Nos. 10, 16, and 20 (Dkt. 33-1) within ten (10) days of this order, if they have not done so already.

3. Plaintiffs have thirty-one (31) days from the issuance of this order to respond to the City Defendants' and County Defendants' motions for summary judgment. (Dkts. 31, 32).

4. The City Defendants and County Defendants have fourteen (14) days to reply to Plaintiffs' response.

DATED: March 01, 2024

Amanda K. Brailsford
U.S. District Court Judge