UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN HALL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANDY MCCLURE, et al.,<br><br>Defendants. | Case No. 1:22-cv-00277-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendant Andy McClure's Motion for Summary Judgment (Dkt. 35) and Motion to Strike (Dkt. 39) and Plaintiffs' Motion for an Expedited Trial (Dkt. 53). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal arguments are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons set forth below, the Court denies Deputy McClure's summary judgment motion and his motion to strike, sets a trial scheduling conference, and denies Plaintiffs' motion for an expedited trial as moot.

## I.  BACKGROUND

The events giving rise to this lawsuit occurred on May 27, 2021, when Deputy McClure responded to a "road rage" incident involving a pickup truck and a semi-truck. (Dkt. 36-1 at p. 2). Although the details of the event are disputed, the driver of the semi-truck ultimately called law enforcement to report the pickup truck for reckless driving. (Dkt. 35-4 at p. 1). Specifically, the semi-truck driver reported that the pickup truck driver, who was later identified as seventy-five-

**MEMORANDUM DECISION AND ORDER - 1**

year-old Plaintiff John Hall, tried to run the semi-truck off the road, made a "finger gun" gesture at the semi-truck driver, and was wearing a cowboy hat. (*Id.*). When the pickup truck exited the interstate, the semi-truck driver followed it to a residence in Gooding County and reported the address to dispatch. (Dkt. 31-2 ¶ 6).

Deputy McClure of the Gooding County Sheriff's Office ("GCSO") responded to the semi-truck driver's call to dispatch. (*Id.* ¶ 1). Dispatch advised Deputy McClure that the pickup truck driver and another male were in the residence's driveway and that one of the individuals was holding an object in his hands. (Dkt. 35-4 at p. 1). Deputy McClure arrived on the scene and observed the semi-truck parked in the street and a pickup truck driving down the residence's long driveway, turning around, and parking at the residence. (*Id.*). After Deputy McClure arrived at the residence, John and his forty-eight-year-old son, Plaintiff James Hall, approached Deputy McClure's patrol vehicle. (*Id.*). John was wearing a cowboy hat, and neither of the men were holding a firearm. (Dkt. 35-4 at p. 1; Dkt. 36-2 ¶ 7).

At this point, the parties offer differing accounts of what occurred.[1] Deputy McClure has submitted his police report from the incident, which he contends accurately reflects what occurred. (Dkt. 35-3). The report provides in relevant part:

> John and James [were] walking in an aggressive manner towards my patrol vehicle. I was able to exit my patrol vehicle as John came close to my driver door[;] John was yelling at me saying "get that son of a bitch down here now."
> I told John to get back as I feared for my safety [due] to his aggressive demeanor towards me and the possibility of weapons being involved. John refused to get back and I again told him to get back. During this interaction I was backed up to the door of my patrol vehicle. I once again told John to back up and he refused

---

[1]     Although video footage of the encounter between the Halls and Deputy McClure apparently exists, none has been provided to the Court. Each of the parties' experts relied on video evidence in formulating their opinions and drafted a factual narrative of the encounter. (Dkt. 31-6, Ex. E at p. 1; Dkt. 35-2, at p. 2). The Court has not relied on the experts' factual narratives to determine the facts of the case, however. The experts do not have firsthand knowledge; their testimony is hearsay; and regardless, their understanding of the facts is not based on specialized knowledge. *See* F.R.E. 602, 701, 702, 801.

**MEMORANDUM DECISION AND ORDER - 2**

to. John was within [arm's] reach of my person so I pushed John in the chest telling him again to get back. Fearing for my safety[,] I had my issued fire arm [sic] unholstered and down to my side. When John continued to ignore my command to back up, I brought my fire arm [sic] up and pointed it at John and told him I feared a gun was involved.

Both John and James began to argue with me about [them] having a gun. I told John and James to put their hands on their head. John [r]eplied to me stating "go to hell[.]" I again told John to put his hands on top of his head and John turned around and began to walk away from me. Again, fearing for my safety because of John's demeanor and his lack of not [sic] following instructions [and] not knowing if a gun was actually involved and being [outnumbered] two to one[,] I grabbed John by the back of his shirt and began to pull him to my patrol vehicle so I could secure his person against the car to place him into handcuffs. John began to fight with me[,] and I holstered my fire arm [sic]. I lost grip of John's shirt as he turned towards me fighting.  As this was going on John was yelling at me stating "get your damn hands off me" "you son of a bitch" "get your hands off of me." James was also yelling at me telling me to "get my hands off of him" as this was taking place[.] James began to approach me yelling in an aggressive manor [sic]. I tried to perform a leg sweep to take John to the ground[,] but I was unsuccessful.

(Dkt. 35-4 at pp. 1-2).

By contrast, John's differing account of the incident provides:

Neither I nor my son, James Hall, were [] acting in an aggressive manner. When I pulled back into the driveway[] [a]nd by the time that I got out of the pickup[,] the deputy was there getting out of his [patrol] truck. He jumped out of the [truck], and he said that his sidearm pointed at me says [sic], "You're under arrest[.]" I said, "What for?"[] And I don't remember what his reply was after that. I was walking up to him. I wasn't charging him, as he alleges in his report—I was walking up to him, going to have a discussion with him. I felt like that [sic] he ought to go down there and approach that trucker. I think I might have said something to the effect you need to get that trucker down here.

(Dkt. 36-2 at ¶ 6; Dkt. 37 at ¶ 6; *see also* Dkt. 31-6, Ex. C at pp. 27-28) (describing encounter during deposition).

John also claims he never made it to Deputy McClure's patrol vehicle before Deputy McClure grabbed him and attempted to perform a leg sweep. (Dkt. 31-6, Ex. C at 27:1-28:12). John acknowledges that after Deputy McClure grabbed him by the shirt, he placed his hand on Deputy McClure's chest "to keep [Deputy McClure] from pulling [him] into [Deputy McClure]."

**MEMORANDUM DECISION AND ORDER - 3**

(*Id.*, Ex. C at 28:9-11). After John resisted Deputy McClure's leg sweep, John claims Deputy McClure "let go" of him. (*Id.*, Ex. C at 28:14).

After Deputy McClure failed to detain John, the parties agree that Deputy McClure drew his taser, and pointed it at John. (Dkts. 35-4 at p. 2; Dkt. 31-6, Ex. C at 28:13-15). Again, however, the parties offer differing accounts of what followed. Deputy McClure claims he ordered John to get on the ground; John responded, "I'm not going to do it"; Deputy McClure radioed dispatch for backup; and John began walking away from him. (Dkt. 35-4 at p. 2). Conversely, John claims that he does not remember Deputy McClure ordering him to get on the ground, his refusal to do so, or walking away from Deputy McClure. (Dkt. 31-6, Ex. C at 29:1-17).

Undisputed, however, is that Deputy McClure fired a taser cartridge at John, striking him in the back. (Dkt. 35-4 at p. 2). McClure's incident report states that John fell to the ground and that James moved towards Deputy McClure with his fists clenched and called Deputy McClure a "cock sucker." (*Id.*) McClure then fired a taser cartridge at James, also striking him in the back. (*Id.*) According to James, at the time he was tased in the back, his hands were in the air. (Dkt. 31-6, Ex. D at 39:21).

After James fell to the ground, Deputy McClure's police report indicates he ordered both men to stay on the ground; John began to get on his hands and knees; and Deputy McClure tased him again. (Dkt. 35-4 at p. 2). Deputy McClure ordered the men not to move, but when John reached with his right hand under his body, Deputy McClure tased him again. (*Id.*) In total, Deputy McClure's taser log indicates he tased John four times and James three times. (Dkt. 32-5, Ex. C at p. 14).

After tasing John and James, Deputy McClure became aware that John's wife, Plaintiff Verla Hall, and his grandson were present. (Dkt. 35-4 at p. 2). Both Verla and the grandson were

yelling at Deputy McClure, and the grandson was recording the incident with his cellphone. (*Id.*) Meanwhile, several other law enforcement personnel arrived, helped Deputy McClure detain John and James, and provided them medical care. After John received medical care, Deputy McClure interviewed both John and the semi-truck driver regarding the alleged road rage incident. (Dkt. 35-4, Ex. A at pp. 3-4). Ultimately, neither man was willing to sign a citation against the other regarding the incident. (*Id.*) Deputy McClure then released John and James and sent a report to the Gooding County Prosecutor's Office for review of charges for obstructing and delaying law enforcement. (*Id.*) No charges were ever filed.

Several days after the incident, the GCSO placed Deputy McClure on administrative leave, pending a use of force policy compliance review, which the Ada County Sheriff's Office (ACSO) conducted. (Dkt. 32-5 at p. 3). The ACSO determined Deputy McClure failed to comply with GCSO policy during the incident, and Deputy McClure subsequently resigned from the GCSO. (Dkt. 32-2 ¶ 17).

In August 2022, the Halls initiated this lawsuit, alleging excessive force and *Monell* claims under 42 U.S.C. § 1983 and state law claims for negligent and intentional infliction of emotional distress. (Dkts. 3, 5). In addition to Deputy McClure, the Halls named several law enforcement officers and entities related to the GCSO and the City of Gooding as defendants ("the City and County Defendants"). The Halls have since voluntarily dismissed their claims against the City and County Defendants. (Dkt. 50). Presently, the only claims remaining are against Deputy McClure for excessive force and negligent and intentional infliction of emotional distress.[2]

---

[2]     Plaintiffs also have outstanding claims against the Idaho State Police, Kedrick Wills, and Sheldon Kelley. Plaintiffs have never served these defendants, however. Accordingly, the Court dismisses all claims against them. *See* Fed. R. Civ. P. 4(m).

**MEMORANDUM DECISION AND ORDER - 5**

Deputy McClure moves for summary judgment on these claims. (Dkt. 35). The Halls oppose that motion and submit John's affidavit and an amended affidavit in support. (Dkts. 36-2 (original), 37 (amended)). Before they were dismissed from the case, the City and County Defendants moved to strike John's amended declaration, and Deputy McClure joined in that motion. (Dkts. 39, 40). After Deputy McClure moved for summary judgment, he filed for bankruptcy, which automatically stayed this action as to the Halls' claims against him. (Dkts. 45, 46). Deputy McClure's bankruptcy case has since been dismissed, and the bankruptcy court has modified the stay to permit the Halls' claims against Deputy McClure to proceed. (Dkt. 52).

## II.  LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence is insufficient. *Id.* at 252. Rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* In deciding whether there is a genuine dispute of material fact, the court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Under Rule 56(c)(1)(A), the nonmoving party asserting a fact is genuinely disputed must support that assertion by particularly citing to materials in the record. The opposing party, however, may object to the cited material if it "cannot be presented in a form that would be

admissible in evidence." Fed. R. Civ. P. 56(c)(2). That a court may only consider admissible evidence in ruling on a summary judgment motion is well established. *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988). The court should sparingly grant motions to strike, however, and only in those instances where the evidence is plainly inadmissible on all potential grounds. *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1218-19 (D. Kan. 2007).

In resolving a claim of qualified immunity, the court must construe disputed factual and credibility issues in favor of the nonmoving party. "[S]ummary judgment [for the defendant] is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was 'clearly established' at the time of the violation." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The plaintiff bears the burden of showing the rights allegedly violated were clearly established. *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).

Qualified immunity is a question of law, not a question of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). "Immunity ordinarily should be decided by the court." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Only when "historical facts material to the qualified immunity determination are in dispute" should the district court submit the factual dispute to a jury. *Torres*, 548 F.3d at 1211. "When there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity. The issue can then be raised in a Rule 50(a) motion at the close of evidence." *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017) (quoting *Ninth Circuit Model Civil Jury Instruction* 9.34 (2017)).

If, however, the only material dispute concerns what inferences properly may be drawn from the historical facts, a district court should decide the issue of qualified immunity. *Conner v. Heiman*, 672 F.3d 1126, 1131 n.2 (9th Cir. 2012) ("[W]hile determining the facts is the jury's job (where the facts are in dispute), determining what objectively reasonable inferences may be drawn from such facts may be determined by the court as a matter of logic and law."). Only the judge can decide whether a particular constitutional right was "clearly established" once any factual issues are resolved by a fact finder. *See Morales*, 873 F.3d at 823.

## III.  ANALYSIS

### A.    Defendants' Motion to Strike

Originally, John timely filed an affidavit in opposition to Deputy McClure's summary judgment motion. (Dkt. 36-2). Two days later, however, John filed an amended affidavit.[3] (Dkt. 37). After Deputy McClure replied to Halls' opposition to his summary judgment motion (Dkt. 38), the City and County Defendants moved to strike the amended affidavit, arguing it is untimely and self-serving. (Dkt. 39). Thereafter, Deputy McClure—who is now the only remaining defendant—joined the motion to strike. (Dkt. 40). Deputy McClure argues the Court should strike Hall's amended declaration as untimely and self-serving. (*Id.*) (joining Dkt. 39).

Deputy McClure is correct that John's amended affidavit was filed two days late. Rule 6(c)(2) of the Federal Rules of Civil Procedure provides that "any affidavit supporting  a motion must be served with the motion." *See also* Dist. Idaho Loc. Civ. R. 7.1(c)(1) (same). Regardless, there is little, if any, substantive difference between the original and amended affidavits. (*Compare* Dkt. 36-2 *with* Dkt. 37). In fact, the only real difference appears to be that

---

[3]    The amended affidavit (Dkt. 37) is mistakenly identified on the court's docket as in support of Hall's summary judgment motion (of which there is none), instead of in opposition to Deputy McClure's summary judgment motion.

**MEMORANDUM DECISION AND ORDER - 8**

the original affidavit is filed under seal while the amended affidavit is not filed under seal; rather, it redacts certain personal identifying information. The amended affidavit also appears to omit cumulative medical documents. Because these differences are not substantive, the amended affidavit's untimeliness does not prejudice Deputy McClure.

Likewise, John's purported "self-serving statements" in his amended affidavit do not prejudice Deputy McClure. The statements Deputy McClure identifies as self-serving relate to facts about the alleged road rage incident. Those facts, however, are irrelevant for determining whether Deputy McClure used excessive force against John and James, is entitled to qualified immunity, or is liable for negligent and intentional infliction of emotional distress. For these reasons, the Court denies Deputy McClure's motion to strike.

### B.    Excessive Force Claim

Deputy McClure argues he is entitled under the qualified immunity doctrine to summary judgment on the Halls' § 1983 claim for use of excessive force. Under this doctrine, "courts may not award damages against a government official in his personal capacity unless the official violated a statutory or constitutional right, and the right was clearly established at the time of the challenged conduct." *Lane v. Franks*, 573 U.S. 228, 243 (2014). Thus, the qualified immunity analysis consists of two prongs: (1) whether the facts show a violation of a constitutional right; and (2) whether that right was clearly established at the time the defendant acted. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc); *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020).

A seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Supreme Court's decision in *Graham* establishes the framework for evaluating excessive force claims. Under *Graham*,

"[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks and citations omitted). *Graham* sets forth three, nonexclusive factors for evaluating excessive force claims, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* Whether the suspect posed an *immediate* threat to the officers or others, however, is the most important consideration. *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1075 (9th Cir. 2017) (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

Other factors may include, for example, the relationship between the need for the use of force and the amount of force used, the extent of the plaintiff's injury, any effort made by the officer to temper or to limit the amount of force, the severity of the security problem at issue, and the threat reasonably perceived by the officer. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). In other words, the question is whether the totality of circumstances justifies the officer's actions. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *see also Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023) (listing factors).

Excessive force claims are analyzed under the objectively reasonable standard. *Lombardo v. City of St. Louis*, 594 U.S. 464, 466 n.2 (2021). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

of force that is necessary in a particular situation." *Id.* at 396-97. Nevertheless, given the fact-intensive nature of excessive force cases, summary judgment should be granted sparingly. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014).

A court has the discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If a court concludes a factual question exists regarding whether the officer violated a constitutional right, then it must determine whether that right was clearly established at the time of the challenged conduct. Whether a right is clearly established turns on whether it is "sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)). In analyzing whether a right is clearly established, the inquiry begins by "defining the law at issue in a concrete, particularized manner." *Shafer*, 868 F.3d at 1117. To show a right was clearly established at the time of the violation, the plaintiff must demonstrate the law gave the officer fair warning the relevant conduct was unconstitutional. *See Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022).

In determining whether a right is clearly established, the court looks to binding precedent, i.e, whether the Supreme Court's or the Ninth Circuit's decisional authority clearly establishes the right. *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). "[I]n the absence of binding precedent, [the court looks] to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation omitted). Generally, a plaintiff need not find "a case directly on point," but existing precedent must have placed the statutory or constitutional question beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, immunity protects

all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017). "The longstanding principle is that clearly established law should not be defined at a high level of generality." *Id.* (quotation omitted). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.*

Showing, however, that the contours of a right are sufficiently clear that every reasonable official would have understood what he was doing violated the plaintiff's right is enough. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 784 (9th Cir. 2022). In other words, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Officials can still be on notice that their conduct violates the law in cases involving the application of well-settled law to a new factual permutation. *Eng v. Cooley*, 552 F.3d 1062, 1076 (9th Cir. 2009).

### 1.   Constitutional Violation

Here, it is undisputed Deputy McClure used his taser in dart-mode to tase the Halls multiple times. The use of a taser in dart-mode, although nonlethal, is not trivial force. Rather, it constitutes an "intermediate, significant level of force" because of the "physiological effects, the high levels of pain, and foreseeable risk of physical injury" associated with it. *Bryan v. MacPherson*, 630 F.3d 805, 825-26 (9th Cir. 2010). Consequently, such force "must be justified by the governmental interest involved." *Id.* at 826.

Whether an officer's use of a taser is justified involves a fact intensive inquiry. The Ninth Circuit has held that the repeated use of a taser against a suspect was reasonable where the suspect was "actively resisting arrest," including "actively struggling" and kicking the officers; the officers

reasonably believed a serious crime was occurring; and the suspect posed an immediate threat to a victim. *Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012). Similarly, the Ninth Circuit has ruled that using a taser against a suspect who actively resisted arrest by running away from a traffic stop was reasonable, even though the suspect was not threatening, had not committed a serious offense, and did not appear to have a weapon. *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017).

Conversely, however, the Ninth Circuit has found a factual question regarding whether a taser's use was unconstitutionally excessive when an officer tased an individual who did not pose an immediate threat but resisted arrest by "refus[ing] to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate" the officers' efforts to remove her. *Mattos*, 661 F.3d at 446. Similarly, the Ninth Circuit has found a factual question when an officer, without warning, tased an individual who was "minimally resist[ing] arrest" by pushing against an officer. *Id.* at 449, 451. The Ninth Circuit has also ruled that, once the suspect is prone and nonthreatening, there is "no continuing justification" for tasing the suspect. *Jones*, 873 F.3d at 1130-31.

Here, Deputy McClure contends his use of force was justified and argues tasing the Halls was objectively reasonable because they were "belligerent" and "actively resisting" his commands; he reasonably believed the Halls could have a weapon; and John "physically" resisted him. (Dkt. 35-5 at p. 6). Considering the *Graham* and other factors and construing the facts in favor of the Halls, as the Court must, it concludes genuine, material factual issues exist regarding whether Deputy McClure's use of force was justified or constitutionally excessive.

Considering the *Graham* factors, the Court finds the possible crimes at issue were not severe. Deputy McClure initially responded to a road rage incident involving a reckless driver and

later referred charges against the Halls to the Gooding County prosecutor for obstructing and delaying law enforcement. Neither reckless driving nor obstructing law enforcement, however, is an inherently serious crime. In fact, both are misdemeanors under Idaho law. *See* I.C. § 18-705 (obstructing law enforcement punishable by fine and imprisonment not exceeding one year); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (noting that trespassing and obstructing a police officer were not severe crimes); *State v. Jones*, 265 P.3d 1155, 1159 (Idaho Ct. App. 2011) (noting "reckless driving" as a type of "misdemeanor traffic violation"). "While the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." *Bryan*, 630 F.3d at 828-29 (citation omitted).  Likewise, "[t]raffic violations generally will not support the use of a significant level of force." *Id.* at 828 (citation omitted).

The Court also finds the Halls were not threatening to any members of the public. For example, the record indicates the semi-truck driver was almost a quarter of a mile away from the incident. (Dkt. 31-6, Ex. D at 44:22-45:2). Whether the Halls' conduct towards Deputy McClure was threatening, however, is disputed. Deputy McClure asserts that the Halls were "aggressive," yelling, and possibly carrying weapons and that James "came at [him] in an aggressive manner" while yelling and "with his fists clenched." (Dkt. 35-4 at p. 2). In contrast, John disputes that either he or James were acting in an aggressive manner or that John was "charging" Deputy McClure. (Dkt. 36-2 at ¶ 6; Dkt. 37 at ¶ 6; *see also* Dkt. 31-6, Ex. C at pp. 27-28) (describing encounter during deposition). While dispatch reported one of the men was holding an object, no evidence supports that Deputy McClure saw either John or James holding any object or reaching for a

weapon before being tased. That Deputy McClure tased both John and James in the back further indicates they were not approaching him in a threatening manner.

Likewise, whether the Halls were actively resisting arrest is disputed. "Resistance . . . should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830.  A court "must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case." *Id.* Although a suspect's resistance may justify an officer's use of some amount of force, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (quoting *Bryan*, 630 F.3d at 830). Even when a suspect is "not perfectly passive," police may not use "significant force" if the suspect is not "particularly bellicose." *Id.* at 1092 (citation omitted).

Here, Deputy McClure's description of the Halls' resistance includes that: (1) they refused to obey his commands, including to put their hands on top of their heads and to get on the ground; (2) John "began to walk away from [him]"; and (3) after he grabbed John's shirt, John "turned towards [him] fighting" and "began to fight with [him]." (Dkt. 35-4 at p. 2). John, however, disputes refusing to comply with Deputy McClure's commands, attesting he does not remember Deputy McClure making any commands, including not to walk away and to get on the ground. (Dkt. 31-6 at p. 29, ll. 4-10). Further, despite Deputy McClure's claim of "fighting," there is no evidence John physically contacted Deputy McClure, other than John's admission that he "stuck [his] hand on [Deputy McClure's] chest to keep [Deputy McClure] from pulling [him] into

[Deputy McClure]. (*Id.* at p. 28, ll. 9-11). For example, Deputy McClure does not even indicate in his report that John touched him.

Without more, John's hand on Deputy McClure's chest is not necessarily active resistance justifying repeated tasing. *See Mattos*, 661 F.3d at 439, 449, 451 (concluding factual question of Fourth Amendment violation despite touching officer's chest to avoid being pulled into officer). Meanwhile, Deputy McClure's factual allegations of James's purported resistance show an even lesser level of resistance than John's. Finally, whether the Halls' conduct justified Deputy McClure tasing them multiple times in the back, including after they were already on the ground presents a question of fact. *See Jones*, 873 F.3d at 1130-31 (ruling that, once the suspect is prone and nonthreatening, there is "no continuing justification" for tasing the suspect). A reasonable jury could find that the Halls' conduct was only minor resistance and not "particularly bellicose" and that Deputy McClure's force was unnecessarily excessive. *Gravelet-Blondin*, 728 F.3d at 1092 (noting nonbellicose conduct "offered little support for the use of significant force"); *Bryan*, 630 F.3d 822, 830 (describing belligerent conduct and ignoring repeated orders to return to car as "passive" or "minor" resistance rather than "truly active resistance").

## 2.  Clearly Established Law

Having concluded factual questions exist regarding whether Deputy McClure violated the Halls' constitutional rights by using excessive force, the Court next considers whether the Halls' right to be free from such force was clearly established at the time of the incident in May 2021. As early as 2013, the Ninth Circuit has held the use of a taser in dart-mode is excessive when used against an individual who is nonthreatening, suspected of a minor crime, and only passively resisting law enforcement. *See Gravelet-Blondin*, 728 F.3d at 1090-92; *see also Thomas v. Dillard*,

818 F.3d 864, 890-91 (9th Cir. 2016) (concluding the tasing of a nonthreatening individual suspected of domestic violence who passively resisted being frisked was excessive).

Further, as early as 2011, the Ninth Circuit ruled that "the use of a taser in drive-stun mode on a person who was actively resisting arrest but was posing no immediate threat to the safety of the officers or to others constitutes excessive force." *M.A.R. by & through Barragan v. City of Los Angeles*, No. 22-55415, 2023 WL 4560832, at *2 (9th Cir. July 17, 2023) (citing *Mattos*, 661 F.3d at 445-46). Similarly, as early as 2018, the Ninth Circuit ruled that "repeatedly using a taser in drive-stun mode on a person who is not posing an immediate threat to the officers raises a genuine issue of material fact precluding qualified immunity, even in the face of conflicting evidence that the person attacked an officer, screamed at officers using profanity, and continued to struggle and not obey officers' commands." *Id.* (citing *Bonivert v. City of Clarkston*, 883 F.3d 865, 879-81 (9th Cir. 2018)).

The rules in *Mattos* and *Bonivert*, as articulated in *M.A.R.* and stated above, address the use of a taser in drive-stun mode. *Id.* Courts have recognized, however, that a taser's force in drive-stun mode is less significant than when used in dart-mode. *See, e.g., Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 950 (9th Cir. 2017) (characterizing drive-stun mode as a "less-incapacitating" version of dart-mode); *Mattos*, 661 F.3d at 443 (noting taser in drive-stun mode "delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode"); *Lindsay v. Kiernan*, 378 F. App'x 606, 608 n.2 (9th Cir. 2010) (noting Ninth Circuit has recognized "the use of a taser in dart mode qualifies as intermediate force [but that] a taser in drive-stun mode qualifies as less than intermediate force"); *Mears v. City of Los Angeles*, No. LA-CV-1508441-JAKA-JWX, 2018 WL 11305362, at *12 n.6 (C.D. Cal. May 7, 2018) ("Although the Ninth Circuit has not expressly determined what level of force is

used when a taser is deployed in drive-stun mode, *see Mattos*, 661 F.3d at 443, it has implied that a taser in dart mode delivers a greater amount of force to the targeted person than one deployed in drive-stun mode."); *Williams v. City of Merced*, No. 1:10-CV-01999-MJS, 2013 WL 498854, at *11 (E.D. Cal. Feb. 7, 2013) (assuming taser used in drive-stun mode constitutes somewhat less than intermediate level of force).

Accordingly, it necessarily follows the clearly-established rules in *Mattos* and *Bonivert* regarding a taser's use in drive-stun mode apply equally to a taser's use in dart-mode. No reasonable basis exists to conclude that conduct which is excessive when using a taser in drive-stun mode would not also be excessive when using a taser in the more forceful dart-mode. For this reason, the Court concludes that, at the time of Deputy McClure's conduct in May 2021, it was clearly established that: (1) "repeatedly using a taser [in any mode] on a person who is not posing an immediate threat to officers raises a genuine material fact precluding qualified immunity, even in the face of conflicting evidence that the person attacked the officer, screamed at the officers using profanity, and continued to struggle and not obey the officers' commands," *M.A.R.*, 2023 WL 4560832, at *2 (citing *Bonivert*, 883 F.3d at 879-81); (2) "us[ing] a taser [in any mode] on a person who was actively resisting arrest but was posing no immediate threat to the safety of the officers or to others constitutes excessive force," *id.* (citing *Mattos*, 661 F.3d at 445-46); and (3) the use of a taser in dart-mode is excessive when used against an individual who is nonthreatening, suspected of a minor crime, and only passively resisting law enforcement, *Gravelet-Blondin*, 728 F.3d at 1090-92.

Under these clearly established rules,[4] genuine questions of material fact exist—as discussed above—whether John and James were threatening to Deputy McClure and actively

---

[4]    Deputy McClure's reliance on *Turner v. Johnigan*, No. 20-55835, 2022 WL 823479 (9th Cir. March 18, 2022), is misplaced. The facts of that case are distinguishable. In that case, the

resisting arrest in a manner justifying Deputy McClure's repeated use of his taser in dart-mode, including after the Halls were on the ground. Considering the Halls' version of the incident as true, John and James were not actively resisting arrest such that repeated tasing was justified. Accordingly, a jury must first determine the disputed factual issues bearing on the issue of qualified immunity before the court can rule on whether Deputy McClure is entitled to qualified immunity. *See Morales*, 873 F.3d at 824 (ruling jury must determine disputed factual issues regarding qualified immunity before court ruling on the issue).

### C. State Law Claims

Deputy McClure has also moved for summary judgment on the Halls' claims for intentional and negligent infliction of emotional distress, arguing the Idaho Tort Claim Act ("ITCA") bars them. The Court agrees. Under the ITCA, a governmental entity is generally liable for the negligent or wrongful acts of its employees acting within the course and scope of their employment if a private person would be liable for such acts under state law. Idaho Code § 6-903(1). The ITCA, however, provides immunity from liability for both a governmental entity and its employees for certain claims, provided the employees were acting within the course and scope of their employment and "without malice or criminal intent." I.C. § 6-904. For purposes of the ITCA, "malice 'involves the intentional commission of a wrongful or unlawful act without legal justification or excuse, whether or not the injury was intended'" and "'criminal intent' means the intentional commission of what the person knows to be a crime." *James v. City of Boise*, 376 P.3d 33, 51 (Idaho 2016) (quoting *Anderson v. City of Pocatello*, 731 P.2d 171, 183 (Idaho 1986)).

---

officer tased Turner, who was suspected of committing two serious felonies, attempted robbery and threatening rape; engaged in "a scuffle" with an officer; and continued resisting officers until he was handcuffed. *Id.* at * 2. Neither John nor James exhibited similar conduct in this case.

**MEMORANDUM DECISION AND ORDER - 19**

The ITCA's immunity extends to any claim that "arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." I.C. § 6-904(3). A claim "arises out of" an item enumerated under § 6-904 if it "originate[s] or stem[s] from such conduct." *James*, 376 P.3d at 51. Thus, the ITCA precludes a claim against a government employee, regardless of legal theory, if the claim stems or originates from conduct enumerated under § 6-904(3). *See Intermountain Constr. v. City of Ammon*, 841 P.2d 1082, 1084 (Idaho 1992); *James*, 376 P.3d at 51 (concluding I.C. § 6-904 precludes intentional infliction of emotional distress claim).

Here, the Halls' intentional and negligent emotional distress claims both arise from Deputy McClure's alleged battery of John and James. To survive summary judgment, the Halls must show Deputy McClure either acted outside the course and scope of his employment or with malice or criminal intent. The Halls, however, have failed to make this showing. Rather, that Deputy McClure was acting within the scope of his employment is undisputed. Deputy McClure's police report does not support a finding of malice or criminal intent. Nor can malice or criminal intent be reasonably inferred simply from his actions. Accordingly, § 6-904(3) precludes the Halls' state law claims.

The Halls appear to suggest § 6-904 does not bar their negligent infliction of emotional distress claim because, in their view, "[a] showing of malice or criminal intent is not necessary for negligence claims[.]" (Dkt. 36-1 at p. 11). The Halls are mistaken. Idaho case law has only recognized that § 6-904(3) bars negligence claims for "failing to *prevent* a loss caused by a battery." *Kessler v. Barowsky*, 931 P.2d 641, 648 (Idaho 1997) (emphasis added). Courts have only applied this exception to claims for negligent planning, execution, or supervision. *Id.* Otherwise, § 6-904 bars claims for negligence, including for negligent infliction of emotional

distress, arising from an item enumerated under that section. *See Greenfield v. City of Post Falls Municipality*, No. 2:13-cv-00437-CWD, 2014 WL 1343478, at *13 (D. Idaho April 3, 2014) (concluding § 6-904(3) barred negligent infliction of emotional distress claim); *Moore v. City of Bonners Ferry*, No. 2:22-cv-00376-BLW, 2024 WL 1051396, at *4 (D. Idaho Mar. 11, 2024) (same)).

Thus, garden-variety negligence claims, like the Halls' negligent infliction of emotional distress claim, is not exempt from the application of § 6-904(3). Moreover, even if the ITCA did not preclude this claim, it fails on the merits. "The elements of negligent infliction of emotional distress are (1) a legal duty recognized by law; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) actual loss or damage." *Berian v. Berberian*, 483 P.3d 937, 951 (Idaho 2020) (citation omitted). "Additionally, there must be a physical manifestation of the plaintiff's emotional injury, which is designed to provide a degree of genuineness that claims of mental harm are not imagined." *Id.* (citation omitted). Here, although John may have suffered physical injuries (Dkt. 37), there is no evidence—at least none in the record—of any physical manifestations of symptoms from *emotional* injuries. Accordingly, the Court grants summary judgment in favor of Deputy McClure on the Halls' state law claims.

## IV.  ORDER

**IT IS ORDERED that:**

1.      Defendant's Motion for Summary Judgment (Dkt. 35) is **GRANTED in part** and **DENIED in part**. The Court denies summary judgment on the Halls' § 1983 claim for excessive force (Count One).  The Court grants summary judgment in favor of Deputy McClure on the Halls' claims for intentional and negligent infliction of emotional distress (Counts Three and Four).

2.      Defendant's Motion to Strike (Dkts. 39, 40) is **DENIED**.

3.      A trial scheduling conference is set for September 16, 2024, at 4 p.m. At least ten days before that conference, counsel shall provide the law clerk with their unavailable dates for trial.

4.      Plaintiffs' Motion for an Expedited Trial is **DENIED** as moot.

5.      All claims against Defendants Idaho State Police, Kedrick Wills, and Sheldon Kelley are **DISMISSED without prejudice**. *See* Fed. R. Civ. P. 4(m).

DATED: August 07, 2024

Amanda K. Brailsford
Amanda K. Brailsford
U.S. District Court Judge